UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SANG W. MENDY,<br><br>    Plaintiff,<br>    v.<br><br>TRACY L. LARSON et al.,<br><br>    Defendants. | CASE NO. 2:22-cv-01426-LK<br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT, GRANTING MOTIONS TO CONTINUE, AND GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT |

This matter comes before the Court on several separate but related motions: Defendant American Security Programs, Inc.'s motion for summary judgment, Dkt. No. 67; Plaintiff Sang Mendy's motions to continue American Security Programs, Inc.'s motion for summary judgment, Dkt. Nos. 71, 107; and Mendy's motion for leave to file an amended complaint, Dkt. No. 73. For the reasons set forth below, the Court denies the motion for summary judgment and grants Mendy's Rule 56(d) motions and motion to amend his complaint.

## I. BACKGROUND

In October 2019, Mendy and his partner moved into the Modera Jackson apartments, a complex that is owned, managed, and operated by Mill Creek Residential Services LLC ("Mill

ORDER DENYING MOTION FOR SUMMARY JUDGMENT, GRANTING MOTIONS TO CONTINUE, AND GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT - 1

1  Creek"). Dkt. No. 4 at 3–4. Mill Creek contracted with Northwest Security Services, Inc.
2  ("Northwest"), a Washington corporation, at the time. *Id.* at 4. Mendy alleges that a Northwest
3  security guard, Tracy Larson, repeatedly harassed him and other black residents. *Id.* at 4–5; *see,*
4  *e.g.*, *id.* at 5 ("Whenever Mr. Larson saw Mr. Mendy alone or with a black friend, he would ask to
5  see his ID, his key fob or ask what room number he was in."); *id.* (documenting another black
6  resident's complaint against Larson for "racially charged" behavior). Mounting tensions boiled
7  over in October 2020 when, following a heated exchange, Larson made an allegedly false assault
8  allegation against Mendy to law enforcement. *See id.* at 7. Mendy was arrested and booked into
9  the King County Jail, but charges were dropped over a year later due to lack of evidence. *Id.* Mendy
10 alleges that in response to Larson's pattern of behavior towards black residents, Mill Creek
11 management eventually requested that Northwest cease stationing him at the Modera Jackson
12 complex. *Id.* at 8.

13       At the time of the alleged assault and Mendy's arrest, Northwest was owned by Stephen
14 and Christina Barger (the "Bargers"). Dkt. No. 69 at 1. On November 24, 2020, about a month
15 after that incident, the Bargers sold all of the issued and outstanding shares of Northwest's capital
16 stock to SecurAmerica, LLC ("SecurAmerica"), a Georgia limited liability company, via a stock
17 purchase agreement ("Agreement"). *Id* at 1–2; *see also* Dkt. No. 96 (the Agreement). As part of
18 the sale, the Bargers agreed that SecurAmerica "shall not assume or become liable for any Retained
19 Liability" and that the Bargers "shall pay, satisfy, and perform all of the Retained Liabilities prior
20 to, or subsequent to, the Closing Date" of November 24, 2020. Dkt. No. 96 at 10. The Agreement
21 defined "Retained Liabilities" as, in relevant part, "any Liability of [Northwest] to any Person for
22 or with respect to any Litigation now existing or hereafter arising with respect to or in connection
23 with any matter or thing that occurred, accrued or arose prior to the Closing Date . . . (even if
24 claimed, brought or filed after the Closing Date[])[.]" *Id.* at 6.

On December 6, 2020, Universal Protection Services, LLC acquired SecurAmerica via an equity purchase agreement. Dkt. No. 68 at 1. This purchase included Northwest and American Security Programs, Inc. ("ASP"), which were both subsidiaries of SecurAmerica at the time. *Id.* On October 27, 2021, Northwest and other entities merged with and into ASP. *Id.*; *see also id.* at 4–7 (articles of merger).

On October 7, 2022, Mendy filed a complaint against Larson, Mill Creek, Northwest, and ASP, alleging violations of Sections 3604(b) and 3617 of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Dkt. No. 1-1. Mendy initially proceeded pro se, but was appointed counsel in May 2023. Dkt. Nos. 42–43.

On March 7, 2024, ASP moved for summary judgment, contending that it was only named as a defendant because it had acquired Northwest after the alleged discrimination. Dkt. No. 67 at 1. ASP argues that Mendy has no basis for liability against it because the Bargers "agreed to retain all liability for actions occurring prior to the sale[.]" *Id.* at 1, 5–7. ASP further avers that, in any event, it should be dismissed as a defendant pursuant to Federal Rule of Civil Procedure 12(b)(6) because Mendy "wholly fails to state any kind of claim against ASP." *Id.* at 5.

On March 18, 2024, Mendy filed a motion to continue ASP's motion for summary judgment under Federal Rule of Civil Procedure 56(d). Dkt. No. 71. Mendy emphasized that discovery had not yet closed and "there are material issues of fact regarding the nature of the transaction between . . . ASP and its former subsidiary [Northwest]." *Id.* at 1–2, 4–7. Mendy nevertheless responded to ASP's motion to summary judgment, reiterating that there are issues of material fact as to whether the Bargers retained liability for incidents arising prior to November 24, 2020. Dkt. No. 82 at 4–7.

Because ASP failed to file a complete version of the Agreement with its motion, the Court ordered ASP to file a complete version by April 26, 2024. ASP then filed a motion for a protective

order, followed by a supplemental motion for a protective order, asking the Court to protect certain portions of the Agreement from disclosure in discovery. Before the supplemental motion had been fully briefed, Mendy filed a second motion to continue. Dkt. No. 107 (noted for May 31, 2024). The Court denied ASP's first motion for a protective order and permitted both parties to submit supplemental briefing "addressing how (if at all) the unredacted information [regarding the purchase price] affects [Mendy's] opposition to ASP's motion for summary judgment[.]" Dkt. No. 99 at 2. The parties completed supplemental briefing on May 23, 2024. Dkt. Nos. 110, 113.

Mendy also filed a motion for leave to file an amended complaint on March 18, 2024. Dkt. No. 73. All four defendants filed responses in opposition. Dkt. Nos. 80, 81, 83.

## II.  DISCUSSION

**A.  Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

**B.  ASP's Motion to Dismiss**

In its motion for summary judgment, ASP seeks to dismiss Mendy's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) because "the only substantive mention of ASP in the Complaint is the statement that it is allegedly liable for [Northwest]." Dkt. No. 67 at 5. This motion is technically improper because ASP has already filed its answer to Mendy's complaint. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004) ("A Rule 12(b)(6) motion must be made *before* the responsive pleading."); *see also* Dkt. No. 27. However, the Court may, at its discretion, treat the untimely motion as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and 12(h)(2), *Elvig*, 375 F.3d at 954, and it does so here because ASP asserted the defense of failure to state a claim in its answer, Dkt. No. 27 at 6; *see Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980) (observing that the case

for conversion "is further strengthened where" an answer "include[s] the defense of failure to state a claim" because the non-movant cannot "claim to have been unprepared"); *Chen v. Clover Park Sch. Dist. No 400*, No. 3:22-cv-05114-BHS-JRC, 2022 WL 18638741, at *2 (W.D. Wash. Dec. 16, 2022), *report and recommendation adopted by* 2023 WL 119434 (W.D. Wash. Jan. 6, 2023); *see also Reilly v. Wozniak*, No. CV-18-03775-PHX-MTL, 2020 WL 1033156, at *3 (D. Ariz. Mar. 3, 2020) ("An important consideration in converting the motion is whether the pleadings raised the affirmative defense at issue.").

"Analysis under Rule 12(c) is substantially identical to analysis under a Rule 12(b)(6)" motion to dismiss. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (cleaned up). Specifically, judgment on the pleadings is appropriate "when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id.* (cleaned up). Under both Rule 12(b)(6) and 12(c), "a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Id.* (internal quotation marks and citation omitted); *Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1161 (W.D. Wash. 2016) ("When a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after an answer has been filed, or when it is functionally equivalent to a motion to dismiss for failure to state a claim, the same standard applies to both.").

ASP argues that it should be dismissed as a defendant because there are "no substantive allegations or facts pleaded against [it] regarding the housing discrimination claim," "no cause[s] of action pleaded against [it]," and "no facts pleaded to support a claim that [it] is potentially liable for [Northwest]." Dkt. No. 67 at 5. The Court disagrees.

As relevant here, the Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

ORDER DENYING MOTION FOR SUMMARY JUDGMENT, GRANTING MOTIONS TO CONTINUE, AND GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT - 5

services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). "To state a claim under § 3604(b), a plaintiff must show she was subjected to different 'terms, conditions, or privileges because of a protected status.'" *Ohana v. Marriott*, No. 2:14-cv-04274-SVW-MRW, 2016 WL 11760169, at *6 (C.D. Cal. Nov. 8, 2016) (quoting *Hous. Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1192 (C.D. Cal. 2004)). The claim can be based on either a disparate treatment or disparate impact theory. *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997). To bring a disparate treatment claim, the plaintiff must allege facts sufficient to show (1) the plaintiff is a member of a class protected under the Fair Housing Act, (2) the defendant exhibited discriminatory conduct in violation of the Fair Housing Act, and (3) as a result of discriminatory conduct, the plaintiff suffered a distinct and palpable injury. *Ohana*, 2016 WL 11760169, at *5 (citing *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999)). The Fair Housing Act not only requires that individuals be given the opportunity to secure housing in a non-discriminatory manner, but also "guarantees their right to equal treatment once they have become residents of that housing." *Sterling*, 404 F. Supp. 2d at 1192.

Mendy's complaint states that "[f]ollowing a merger dated October 27, 2021, [ASP became] the legal owner of all assets, debts and liabilities that accrued to Northwest[.]" Dkt. No. 4 at 3; *see also id.* at 2 (alleging that Northwest, "complete with all of its assets, debts and liabilities merged into [ASP]"). It alleges that Northwest's "negligent hiring, training, and supervision created a pattern and practice of Black residents being denied the same privileges as other residents and being made unsafe in their homes," and that its "negligent hiring, training, and supervision and failure to take seriously allegations of [its] employees' racially charged language and discriminatory actions" led to "violations of the Federal Fair Housing Act, because Black residents did not enjoy the same privileges as other residents and in fact were harmed by having the police called on them, made unsafe in their own home by the security that was supposed to protect them."

*Id.* at 6, 8–9. Mendy specifically alleges that he was subjected to harassment and a false accusation of assault by a Northwest security officer because he was Black, resulting in Mendy spending a night in jail and not being able to work for 13 months while the City of Seattle's charges were pending against him. *Id.* at 7–10. He avers that this was not an isolated occurrence, as "Northwest Security Services and Mill Creek Residential were aware of multiple incidents where Defendant Mr. Larson racially profiled and harassed Black residents at the Modera Jackson." *Id.* at 3; *see also id.* at 5–7 (describing another incident of allegedly racially motivated harassment against a Black resident by Larson). Mendy also alleges that Northwest "created a hostile housing environment based on race" and "failed to take any action to prevent or otherwise discourage [its] officers from racially profiling or harassing Black residents at the apartment complexes where [it was] contracted to provide security for all residents equally and without discrimination." *Id.* at 2, 6. According to Mendy, ASP, along with the other Defendants, is "responsible for these violations of the Federal Fair Housing Act, for making sure that these discriminatory practices do not continue, and for making [him] whole." *Id.* at 9. These allegations adequately set forth a theory of Fair Housing Act liability against ASP.

Because Mendy has adequately pleaded a Fair Housing Act claim against ASP (via his claims against Northwest), ASP's motion to dismiss is denied.

C. **ASP's Motion for Summary Judgment and Mendy's Motions to Continue**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89.

ASP contends that it is "not liable for the liabilities or actions" of Northwest because the Bargers "explicitly agreed to retain pre-closing liabilities" in the Agreement, "which include this suit because the actions giving rise to suit occurred prior to November 24, 2020." Dkt. No. 67 at 5–6; *see also* Dkt. No. 85 at 2 (contending that the Agreement "supersedes any liability that could possibly pass to the successor corporation"). The Agreement provides that SecurAmerica "shall not assume or become liable for any Retained Liability" and that the Bargers "shall pay, satisfy, and perform all of the Retained Liabilities prior to, or subsequent to, the Closing Date" of November 24, 2020. Dkt. No. 96 at 10; *see also id.* at 3; Dkt. No. 69 at 1–2. These "Retained Liabilities" explicitly include "any Liability of [Northwest] to any Person for or with respect to any Litigation now existing or hereafter arising with respect to or in connection with any matter or thing that occurred, accrued or arose prior to the Closing Date . . . (even if claimed, brought or filed after the Closing Date[])[.]" Dkt. No. 96 at 6. The Agreement defines "Liability" as "any direct or indirect, primary or secondary, liability, indebtedness, obligation, claim, deficiency, guaranty or endorsement of or by any Person . . . of any type, whether accrued, absolute,

contingent, liquidated, unliquidated, matured, unmatured or otherwise[.]" *Id.* at 5. And the Agreement defines "Litigation" as "any lawsuit, action, claim, arbitration or other legal proceeding (including governmental proceedings, investigations, fines or criminal prosecutions)." *Id.*

It is undisputed that Mendy's claims in this lawsuit qualify as Retained Liabilities under the Agreement. *See generally* Dkt. Nos. 67, 82, 85, 110. The key dispute is whether the Bargers assumed liability for Retained Liabilities (including Mendy's claims) under the Agreement, or whether they instead merely agreed to pay for any Retained Liabilities as they arose. Dkt. No. 67 at 5–6; Dkt. No. 85 at 3; Dkt. No. 110 at 5–6; Dkt. No. 113 at 2–3.

The parties largely talk past one another on this point. ASP repeatedly asserts in conclusory fashion that the Bargers assumed liability under the Agreement, *see, e.g.*, Dkt. No. 67 at 6; Dkt. No. 85 at 2; Dkt. No. 113 at 2, while Mendy repeatedly asserts in conclusory fashion that Northwest retained liability for its pre-closing actions, *see, e.g.*, Dkt. No. 82 at 3; Dkt. No. 110 at 5–6. Neither party's briefing meaningfully engages with the contract language, which is the starting point of the Court's analysis. *See Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992). Nor does either party identify the governing law for the Court's contract analysis. *See* Dkt. No. 96 at 31.

Such analysis is crucial to resolution of the issue. Section 2.6 of the Agreement—the Retained Liabilities provision—explicitly insulates SecurAmerica from "assum[ing] or becom[ing] liable for any Retained Liability" of Northwest, which includes any "liabilities" arising from the instant "lawsuit" or "action." Dkt. No. 96 at 6, 10. But significantly, the provision does not equally provide that the Bargers would "assume or become liable" for such liabilities; rather, it states that the Bargers "shall pay, satisfy, and perform all of the Retained Liabilities prior to, or subsequent to," November 24, 2020. *Id.* at 10. The parties do not address the significance of the Bargers' and SecurAmerica's choice to use the "pay, satisfy, and perform" language when

referring to the Bargers' obligations relative to the Retained Liabilities and the "assume or become liable for" language when referring to SecurAmerica's obligations relative to the Retained Liabilities. "The use of different language to address the same or similar issue . . . strongly implies that a different meaning was intended." *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 246 (3d Cir. 2008); *see also Cheli v. Taylorville Comm. Sch. Dist.*, 986 F.3d 1035, 1044–45 (7th Cir. 2021) ("[W]hen parties to the same contract use different language to address parallel issues, it is reasonable to infer that they intend this language to mean different things." (cleaned up)); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156–57 (10th Cir. 2007) ("When a contract uses different language in proximate and similar provisions, we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings."). Indeed, it appears to be standard practice to include the word "assume" when allocating liability to a particular party. *See, e.g.*, *Merck & Co. v. Bayer AG*, No. 2021-0838-NAC, 2023 WL 2751590, at *2 (Del. Ch. Apr. 3, 2023) ("assume and thereafter pay, perform and discharge"); *Sofregen Med. Inc. v. Allergan Sales, LLC*, No. N20C-03-319 EMD CCLD, 2023 WL 2034584, at *6 (Del. Super. Ct. Feb. 3, 2023) ("assume and pay, discharge, perform or otherwise satisfy"); *Coughlan v. NXP B.V.*, No. 5110-VCG, 2011 WL 5299491, at *11 (Del. Ch. Nov. 4, 2011) ("assume, pay when due, satisfy, discharge, perform and fulfill"). The parties also do not address language in the Agreement's Indemnification provision that may shed light on the meaning of the words in the Retained Liabilities provision. *See* Dkt. No. 96 at 27 (obligating the Bargers to indemnify SecurAmerica if they fail to "pay or discharge" any Retained Liability).

The parties' lack of engagement with the contract language makes it unclear whether either party might contend that extrinsic evidence is necessary to determine the meaning of the relevant language. Furthermore, as Mendy points out, ASP's initial failure to "put into the record the entire

contract between [the Bargers] and Secur[A]merica" hampered his ability to respond, Dkt. No. 71 at 6, and Mendy has not yet been provided the opportunity to file a fulsome response to ASP's motion with the benefit of the full (albeit partially redacted) Agreement, *see* Dkt. No. 107 at 4 ("Mendy will be prejudiced if he cannot cite . . . the full [Agreement] with additional redactions which he did not get an opportunity to cite in his Response to ASP's Motion.").

Rule 56(d) provides that if the nonmoving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Relief may be denied, however, if that party has not acted diligently in pursuing discovery or fails to show how the information sought would preclude summary judgment. *See California Union Ins. Co. v. Am. Diversified Sav. Bank*, 914 F.2d 1271, 1278 (9th Cir. 1990).

Because ASP has not adequately supported its interpretation of the Retained Liabilities provision, because the meaning of this provision is potentially dispositive,[1] and because it is unclear at this point whether extrinsic evidence will be necessary to construe the language, the

---

[1] In the Agreement, SecurAmerica purchased Northwest's assets and "all of [its] issued and outstanding shares of capital stock[.]" Dkt. No. 96 at 3; *see also id.* at 7. Because "[a] transfer of all of a company's stock automatically transfers ownership of all of the company's underlying assets and liabilities," 12 William M. Fletcher, Fletcher Cyclopedia of the Law of Corps. ("Fletcher") § 5463 (2023), Northwest retained its liabilities absent agreement to the contrary. *See Textron Inc. v. Acument Glob. Techs., Inc.*, 108 A.3d 1208, 1212 (Del. 2015) (distinguishing between a "typical stock sale" and a "typical asset sale"); *Claimant ID 100009540 v. BP Expl. & Prod., Inc.*, 680 Fed. App'x 263, 267–68 (5th Cir. 2017) ("It is well-established that the life of an entity *continues* in a stock sale, whereas assets are transferred to a *different* entity in an asset sale."); *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, No. N14C-12-112-WCC-CCLD, 2015 WL 5968726, at *3 (Del. Super. Ct. Sept. 25, 2015) ("[I]t is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock." (quoting *In re KB Toys Inc.*, 340 B.R. 726, 728 (D. Del. 2006))). While SecurAmerica as the parent company did "not assume or become liable for any Retained Liability," ASP points to no provision in the Agreement indicating that Northwest as a wholly owned subsidiary cannot be held liable for any Retained Liability. Dkt. No. 96 at 10; *see also generally* Dkt. Nos. 67, 85. There is no evidence in the record reflecting the terms of the Universal Protection Service, LLC acquisition, but to the extent Northwest continued to retain liability following that acquisition, ASP agreed to assume "all debts, liabilities and duties" of the non-surviving entities that merged into it in October 2021, including Northwest. Dkt. No. 68 at 5.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT, GRANTING MOTIONS TO CONTINUE, AND GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT - 11

1  Court grants Mendy's 56(d) motions and denies ASP's motion without prejudice to renewing the
2  motion by the dispositive motions deadline. Dkt. Nos. 71, 107.

3  **D.     Mendy's Motion for Leave to File an Amended Complaint**

4  Under Federal Rule of Civil Procedure 15(a)(2), a court should generally "freely give
5  leave" to amend a complaint "when justice so requires" unless it finds "the presence of any of four
6  factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." *Owens v. Kaiser
7  Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Griggs v. Pace Am. Grp.,
8  Inc.*, 170 F.3d 877, 880 (9th Cir. 1999)); *accord Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d
9  1048, 1052 (9th Cir. 2003) ("Absent prejudice, or a strong showing of any of the remaining four
10 factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." (cleaned
11 up)).

12 Mendy states that he is seeking leave to file an amended complaint "to include additional
13 facts that clarify the underlying basis for his Fair Housing [Act] Complaint," to add allegations
14 "concerning Mill Creek and [Northwest] not making any efforts to preserve video surveillance
15 footage of interactions between Tracy Larson and Mr. Mendy on October 9, 2020," and to better
16 describe "legal relationships between the parties by affirmatively stating the agency relationship
17 between Mill Creek and [Northwest]." Dkt. No. 73 at 1–3. Mendy also adds several specific
18 proposed amendments directed towards ASP, seemingly in response to ASP's motion for summary
19 judgment, and alleges that Defendants engaged in negligent training and supervision relative to
20 video footage retention. Dkt. No. 74-1 at 1–2, 9–10. Defendants argue that Mendy's motion should
21 be denied because his proposed amendments are futile. ASP also argues that Mendy's amendments
22 relating to preservation of video footage are untimely because that issue "was known to Mr. Mendy
23 when he filed the complaint." Dkt. No. 81 at 3.

24

1  "[L]eave to amend should be denied as futile 'only if no set of facts can be proved under
2  the amendment to the pleadings that would constitute a valid and sufficient claim or defense[.]'"
3  *Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018) (quoting *Sweaney v. Ada*
4  *Cnty.*, 119 F.3d 1385, 1393 (9th Cir. 1997)). "Futility alone can justify the denial of a motion for
5  leave to amend." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). "However, denial on this
6  ground is rare and courts generally defer consideration of challenges to the merits of a proposed
7  amended pleading until after leave to amend is granted and the amended pleading is filed." *Clarke*
8  *v. Upton*, 703 F. Supp. 2d 1037, 1043 (E.D. Cal. 2010) (citing *Netbula, LLC v. Distinct Corp.*, 212
9  F.R.D. 534, 539 (N.D. Cal. 2003)); *see also* Phillips & Stevenson, Rutter Group Practice Guide,
10 Federal Civil Procedure Before Trial § 8:1514 (The Rutter Group 2024). Futility is "often more
11 appropriately raised in a motion to dismiss rather than in an opposition to a motion for leave to
12 amend." *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1154 (N.D. Cal. 2010)
13 (quoting *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2002)); *see*
14 *also Puget Soundkeeper All. v. APM Terminals Tacoma LLC*, 545 F. Supp. 3d 893, 897–98 (W.D.
15 Wash. 2021) (declining to find that amendment was futile and concluding that the issue was "better
16 suited for a fully-briefed dispositive motion").

17  Mendy's proposed amendments are not a model of clarity, but they are permissible under
18 this standard. His amendments regarding video surveillance provide additional facts to bolster his
19 Fair Housing Act claims. These amendments do not add a new cause of action for spoliation, as
20 Defendants contend, but instead suggest that Defendants' alleged discrimination is underscored by
21 their failure to retain or review video footage from the incident. *See* Dkt. No. 74-1 at 2 (alleging
22 that video footage would have proven Larson's discrimination against Mendy), 5–6 (alleging that
23 Mill Creek staff reached out to Northwest to "gain a more detailed statement from you and your
24 agents' end of exactly what took place" with respect to a prior complaint about Larson, but then

"did nothing to follow up on Mr. Larson's record, character or risk to the community"), 7–8 (alleging that Mill Creek staff were aware of Mendy's arrest and a "pattern in Mr. Larson's actions" by October 2020), 10 (alleging that Defendants Mill Creek, Northwest, and ASP were capable of preserving or recovering footage of the incident that would have shown Larson's accusations against Mendy to be false); *see also* Dkt. No. 87 at 3–4 (suggesting that "Mill Creek and [Northwest] ha[d] the ability to review video of Mendy and Larson but intentionally chose not to due to discriminatory bias"). In the same vein, Mendy's proposed amendments regarding ASP better articulate Mendy's theory of its liability, but do not change the core of that theory; as discussed above, Mendy's original complaint already alleges that "[f]ollowing a merger dated October 27, 2021, Defendant [ASP] is the legal owner of all assets, debts and liabilities that accrued to [Northwest]" and that ASP is "responsible for . . . violations of the Federal Fair Housing Act[.]" Dkt. No. 4 at 3. Given that Mendy sought to amend his complaint before the deadline for amended pleadings, Dkt. No. 53, and his amendments appear to be based at least in part on information obtained in discovery, *see* Dkt. No. 87 at 3, the Court finds that his motion to amend was not untimely. And importantly, no Defendant alleges that it would be prejudiced by these amendments. There is also no evidence that Mendy's motion to amend was the product of bad faith. To the extent the parties wish to argue about these additions to Mendy's complaint, they may do so in a dispositive motion.

However, to the extent that Mendy is seeking to add a substantive negligent training and supervision claim, his proposed amendments fail to state a claim. *See* Dkt. No. 74-1 at 1, 8. An action based on negligent training and supervision "is applicable *only* when the [employee] is acting outside the scope of his employment." *Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 208 (Wash. 2018) (quoting Restatement (Second) of Torts § 317 cmt. a). "If the employee is acting within the scope of his employment, then an employer is vicariously liable under the principles of

ORDER DENYING MOTION FOR SUMMARY JUDGMENT, GRANTING MOTIONS TO CONTINUE, AND GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT - 14

the law of [a]gency instead." *Id.* (cleaned up). Mendy does not allege in his amended complaint that any employees involved in the incident were acting outside the scope of their employment. The Court notes that Mendy insists that his allegations regarding retaining or viewing video footage do not constitute a negligence claim. Dkt. No. 87 at 4 ("Mr. Mendy only mentions Defendant's negligence regarding retaining or viewing video footage to show further evidence how the Defendant's [sic] interfered with his fair housing rights, and create a hostile housing environment based on Race."). The Court will hold him to these representations.

Accordingly, the Court grants Mendy's motion to amend; provided, however, that it does not construe the proposed amended complaint, Dkt. No. 74-1, to add any new cause of action.

### III.  CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

1. ASP's motion for summary judgment, Dkt. No. 67, is DENIED;

2. Mendy's motions to continue summary judgment, Dkt. Nos. 71, 107, are GRANTED; and

3. Mendy's motion for leave to file an amended complaint, Dkt. No. 73, is GRANTED. No later than June 15, 2024, Mendy must file a clean version of his amended complaint. Dkt. No. 74-1.

Dated this 10th day of June, 2024.

Lauren King
United States District Judge