1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SANG W. MENDY,

               Plaintiff,

     v.

TRACY L. LARSON et al.,

               Defendants.

CASE NO. 2:22-cv-01426-LK

ORDER ON MOTIONS

This matter comes before the Court on six separate but interrelated motions: (1) Defendants Tracy L. Larson and Northwest Security Services, Inc.'s Amended Motion for Summary Judgment, Dkt. No. 124-1; (2) Defendant Mill Creek Residential Services LLC's Amended Motion for Summary Judgment, Dkt. No. 126-1; (3) Plaintiff Sang Mendy's Cross-Motion for Partial Summary Judgment, Dkt. No. 147; (4) Defendant American Security Programs, Inc.'s Cross-Motion for Summary Judgment, Dkt. No. 155; (5) Defendants' Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Claim for Punitive Damages, Dkt. No. 148; and (6) Mendy's Motion for Sanctions for Spoliation of Evidence, Dkt. No. 150. For the following

reasons, the Court grants Larson and Northwest Security Services' motion for summary judgment, grants summary judgment to the remaining defendants, and denies the remaining motions as moot.

## I.    BACKGROUND

### A.    Mill Creek's Ownership of Modera Jackson and Relationship with NWSS

At all relevant times, Mill Creek Residential Services LLC owned, managed, and operated the Modera Jackson apartments, an apartment complex in Seattle, Washington. Dkt. No. 123 at 3.

Mill Creek entered into a service agreement in October 2018 with Northwest Security Services ("NWSS") for NWSS to provide security patrols at Modera Jackson. Dkt. No. 126-15 at 2. One of NWSS's security personnel who patrolled Modera Jackson was Tracy Larson. Dkt. No. 123 at 3.

### B.    Mendy's Interactions with Larson

Plaintiff Sang Mendy and his family moved into Modera Jackson in October 2019. Dkt. No. 123 at 4. He claims that after he moved in, there were instances when he would encounter Larson and Larson "would mumble something [i]n a very, very low voice or provoke a question of, like, 'Do you live here?' you know or 'Can I see your ID?'" Dkt. No. 120-4 at 3.

On the evening of October 8, 2020, Mendy was sitting by himself and talking on the phone in Modera Jackson's fifth-floor lounge when Larson got off the elevator behind him. Dkt. No. 126-3 at 5–6; Dkt. No. 131-2 at 4. Mendy's and Larson's versions of events differ from there. Larson claims that he had never seen or met Mendy before, Dkt. No. 131-3 at 3; *see also* Dkt. No. 120-5 at 2; Dkt. No. 126-17 at 2, but as soon as he encountered Mendy and said hello, Mendy "jumped out of th[e] chair," "turn[ed] around and start[ed] punching [him.]" Dkt. No. 131-3 at 3.

Mendy claims that after Larson exited the elevator, he approached Mendy and asked him at least twice if he lived at Modera Jackson. Dkt. No. 131-2 at 4 ("Then he started asking me the same question. Um… 'do you live here?'"). Mendy then stood up, got "face-to-face" with Larson,

pointed at his face, and told Larson that he should have recognized Mendy's face by then. Dkt. No. 131-2 at 4. Larson then allegedly backed away and told Mendy not to hit him, to which Mendy responded, "Why would I hit you? You just need to know this face." Dkt. No. 126-3 at 6–7; Dkt. No. 131-2 at 4.

Both Larson and Mendy agree on the subsequent events. Larson "bee-lined it for the elevators," and Mendy followed him and continued to confront him after Larson was in the elevator. Dkt. No. 131-3 at 3–4; Dkt. No. 162 at 12. Larson then took the elevator downstairs to the lobby and went through the door to the garage where he had parked his car to retrieve his phone. Dkt. No. 131-3 at 3–4; *see also* Dkt. No. 120-5 at 2. Mendy followed him down on the next elevator. Dkt. No. 126-3 at 7–8; Dkt. No. 126-4 at 5–6; *see also* Dkt. No. 120-5 at 2. Larson then called 911, telling the operator that Mendy had "assaulted [him] while [he] was trying to do [his] patrol." Dkt. No. 131 at 2 (Ex. C at 00:05–0:07); *id.* (Ex. C at 00:32–00:34 (telling operator that Mendy "jumped up and punched [him]")); *see also* Dkt. No. 120-5 at 2. After Mendy entered the garage, Larson told Mendy that he was "not allowed to leave" and that he was "calling the police." Dkt. No. 126-3 at 7–8; Dkt. No. 126-4 at 5–6.

Larson and Mendy also agree on what happened next: Mendy exited the garage and went to the lobby, where he tried to get back on the elevator to go upstairs, but Larson prevented him from getting to the elevator. Dkt. No. 126-3 at 8–9; Dkt. No. 126-4 at 2–3, 5–6; Dkt. No. 131-3 at 5. Mendy asked two other residents who were present in the lobby at the time to tell Larson that he lived at Modera Jackson, but neither did; instead, one of them asked Mendy if he had a key fob. Dkt. No. 126-3 at 8–9; Dkt. No. 126-4 at 4, 7. Mendy did not respond. Dkt. No. 126-3 at 9; Ex. E. to Dkt. No. 131 at 11:26–11:33 (Larson informing responding officer that "the [tenants] started challenging, 'Do you live here? Do you live here?' and [Mendy] wouldn't give an answer"). He continued to try to go back upstairs, but Larson prevented him from doing so. Dkt. 126-4 at 3

1    (Mendy testifying that Larson restrained him and "kind of slapp[ed his] hand off trying to hit the

2    elevator button"); Dkt. No. 120-5 at 3 (Larson told police that he "stood in front of the elevator

3    controls" to prevent Mendy from returning upstairs).

4         The police arrived soon after and witnessed Mendy pushing Larson. Dkt. No. 126-4 at 3;

5    Dkt. No. 131-3 at 5; Dkt. No. 120-5 at 2–3. Although Mendy maintains that he never made physical

6    contact with Larson, Dkt. No. 126-3 at 8; Dkt. No. 126-6 at 2; Dkt. No. 131-2 at 3, Mendy was

7    arrested for assault and booked in King County jail for two nights. Dkt. No. 120-5 at 3; Dkt. No.

8    123 at 7; Dkt. No. 126-4 at 3–4. The charges were eventually dropped in November 2021. Dkt.

9    No. 126-5 at 4.

10   **C.    Mill Creek's Subsequent Actions**

11        On October 12, 2020, after Mendy was released from jail, he went to Modera Jackson's

12   office and described the incident to Natalie Benoit, a Mill Creek employee who was a Community

13   Manager at Modera Jackson at the time. Dkt. No. 126-17 at 4. The same day, Benoit emailed

14   Felicity Alexander, another Community Manager at Modera Jackson, informing her of the incident

15   and relaying that Mendy "ultimately felt racially profiled by our security guard due to being

16   questioned if he lived at the property when he has a key." Dkt. No. 162 at 78; Dkt. No. 126-17 at

17   4. On October 19, 2020, Alexander sent an email to NWSS requesting that Larson "no longer [be]

18   sent to Modera Jackson." Dkt. No. 131-4 at 4. After NWSS requested video surveillance of the

19   incident, Alexander responded that Mill Creek "[did] not have any video [of the October 8

20   incident] that [she was] aware of." *Id.* at 3. NWSS insisted that Larson followed "proper

21   procedures" during the altercation, but noted that he had already been reassigned to a different

22   location by happenstance and would therefore "not be back to" Modera Jackson. *Id.* at 2.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### D.     Change in Ownership of NWSS

At the time of the alleged assault and Mendy's arrest, NWSS was owned by Stephen and Christina Barger (the "Bargers"). Dkt. No. 69 at 1. On November 24, 2020, about a month after that incident, the Bargers sold all of the issued and outstanding shares of NWSS's capital stock to SecurAmerica, LLC ("SecurAmerica"), a Georgia limited liability company, via a Stock Purchase Agreement. *Id.* at 1–2; *see also* Dkt. No. 96 (the Stock Purchase Agreement). As part of the sale, the Bargers agreed that SecurAmerica "shall not assume or become liable for any Retained Liability" and that the Bargers "shall pay, satisfy, and perform all of the Retained Liabilities prior to, or subsequent to, the Closing Date" of November 24, 2020. Dkt. No. 96 at 10. The Stock Purchase Agreement defined "Retained Liabilities" as, in relevant part, "any Liability of [NWSS] to any Person for or with respect to any Litigation now existing or hereafter arising with respect to or in connection with any matter or thing that occurred, accrued or arose prior to the Closing Date . . . (even if claimed, brought or filed after the Closing Date[])[.]" *Id.* at 6.

On December 6, 2020, Universal Protection Services, LLC acquired SecurAmerica via an equity purchase agreement. Dkt. No. 68 at 1. This purchase included NWSS and American Security Programs, Inc. ("ASP"), which were both subsidiaries of SecurAmerica at the time. *Id.* On October 27, 2021, NWSS and other entities merged with and into ASP. *Id.*; *see also id.* at 4–7 (articles of merger).

### E.     Procedural History

On October 7, 2022, Mendy filed a complaint against Larson, Mill Creek, NWSS, and ASP, alleging that Defendants violated Section 3617 of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and "created a hostile housing environment based on race" under 42 U.S.C. § 3604(b). Dkt. No. 4 at 1–2. Mendy initially proceeded pro se, but was appointed counsel in May 2023. Dkt. Nos. 42–43.

1   On March 7, 2024, ASP moved for summary judgment, arguing that Mendy had no basis

2   for liability against it because the Bargers "agreed to retain all liability for actions occurring prior

3   to the sale[.]" Dkt. No. 67 at 1, 5–7. ASP further averred that, in any event, it should be dismissed

4   as a defendant pursuant to Federal Rule of Civil Procedure 12(b)(6) because Mendy "wholly

5   fail[ed] to state any kind of claim against [it]." *Id.* at 5. The Court denied ASP's motion because

6   ASP "ha[d] not adequately supported its interpretation of the Retained Liabilities provision" and

7   because "it [was] unclear at th[at] point whether extrinsic evidence w[ould] be necessary to

8   construe the language[.]" Dkt. No. 121 at 11–12, 15. This denial was without prejudice to renewing

9   the motion by the dispositive motions deadline. *Id.* at 11–12. The Court also denied ASP's motion

10  to dismiss because Mendy "adequately pleaded a Fair Housing Act claim against [it] (via his claims

11  against [NWSS])." *Id.* at 7.

12     Mendy amended his complaint on June 11, 2024. Dkt. No. 123. Mendy continues to allege

13  that "the Defendants 'created a hostile housing environment based on race[]'" and "interfered with

14  [his] Fair Housing Rights based on Race" under Section 3617. *Id.* at 1.[1] Mendy seeks an injunction,

15  special and general compensatory damages, and punitive damages. *Id.* at 11.

16     The parties subsequently filed their respective dispositive motions in this case. On June 12,

17  2024, NWSS and Larson filed a motion for summary judgment, arguing that they could not be

18  held liable under the FHA because they do not qualify as housing providers under that Act, and

19  regardless, Mendy "lacks the requisite evidence to satisfy essential elements of a hostile housing

20  environment claim." Dkt. No. 124-1 at 2. Mill Creek filed its own motion for summary judgment

21  five days later, contending that it was not liable for Mendy's FHA claims because neither NWSS

22  nor Larson had an actual or apparent agency relationship with Mill Creek. Dkt. No. 126-1 at 1–2,

23

24  ---
[1] Unlike most complaints, Mendy's amended complaint does not contain separate sections dedicated to describing his causes of action. *See generally* Dkt. No. 123.

6–9. Mendy and ASP then filed cross-motions for summary judgment regarding whether ASP could be held liable for NWSS's alleged actions under the Retained Liabilities provision of the Stock Purchase Agreement. Dkt. Nos. 147, 155. All four defendants also filed a joint motion for partial summary judgment, seeking to strike Mendy's claim for punitive damages in the event the Court denies either the motion for summary judgment filed by Mill Creek (Dkt. No. 126-1) or by NWSS and Larson (Dkt. No. 124-1). Dkt. No. 148 at 2.

On July 19, 2024, Mendy also filed a motion requesting that the Court sanction Mill Creek for spoliation of evidence. Dkt. No. 150. Specifically, Mendy claims that Mill Creek failed to preserve surveillance video that showed part of the incident between Mendy and Larson, and therefore the Court should sanction Mill Creek by instructing the jury to make an adverse inference regarding the presumed content of the video surveillance. *Id.* at 1–2.

## II.   DISCUSSION

### A.   Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Mendy alleges violations of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

### B.   Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

1    the facts specifically averred by that party contradict facts specifically averred by the movant, the

2    motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

3         The Court will, however, enter summary judgment "against a party who fails to make a

4    showing sufficient to establish the existence of an element essential to that party's case, and on

5    which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

6    (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

7    come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

8    *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified). Metaphysical

9    doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at

10   888–89. Last, the Court notes that "for purposes of ruling on a motion for summary judgment, [it]

11   may properly view the facts in the light depicted by bodycam footage and its accompanying audio,

12   to the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v.*

13   *Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

14   **C.    NWSS and Larson's Motion for Summary Judgment**

15        NWSS and Larson move for summary judgment on two grounds. First, they contend that

16   they cannot be held liable for Mendy's claims because they do not qualify as housing providers

17   under the FHA. Dkt. No. 124-1 at 6–7. Second, they contend that Mendy lacks the requisite

18   evidence of discriminatory intent and that their conduct in any event was not sufficiently severe or

19   pervasive to create a hostile housing environment. *Id.* at 7–9.

20        1.    The FHA Applies to NWSS and Larson

21        NWSS and Larson contend that Mendy's FHA claims against them fail because they "are

22   not involved in the provision of housing and ha[d] no control over affecting access to housing at

23   Modera Jackson." Dkt. No. 124-1 at 2, 7. Thus, "[b]ecause [they] do not qualify as 'housing

24   providers' under the FHA, [Mendy's] FHA claim against [them] necessarily fails." *Id.* at 7.

The Court disagrees. The language of the FHA neither defines "housing providers" nor explicitly limits liability to "housing providers." *See generally* 42 U.S.C. §§ 3601–19; *see also* 42 U.S.C. § 3602 (definitions). NWSS and Larson rely only on *Sanzaro v. Ardiente Homeowners Ass'n*, 364 F. Supp. 3d 1158 (D. Nev. 2019), where the court relied on a joint agency statement between the Department of Justice and the Department of Housing and Urban Development to illustrate the broad coverage of the FHA in finding that a homeowners association, a property management company, and a developer could all be held liable for violations of the FHA. Dkt. No. 124-1 at 6; *Sanzaro*, 364 F. Supp. 3d at 1176 (quoting Joint Statement of the Dep't of Hous. and Urb. Dev. and the Dep't of Just., Reasonable Accommodations Under the Fair Housing Act at 3 (May 17, 2004) ("Joint Agency Statement")), *available at* https://web.archive.org/web/20220120061812/https://www.hud.gov/sites/documents/DOC_7771. PDF (last visited September 2, 2025). There is nothing in either *Sanzaro* or the Joint Agency Statement suggesting that liability under the FHA is limited to "housing providers."

To the contrary, Section 3617 of the FHA simply declares that it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" certain sections of the FHA, including Section 3604, without specifying who may be held responsible for those practices. 42 U.S.C. § 3617. Section 3604, in turn, similarly declares certain housing practices to be unlawful without limiting who may be liable. *See, e.g.*, 42 U.S.C. § 3604(b) (it shall be unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin"). It is therefore of no moment that NWSS and Larson "merely contracted with the property management company to provide security services to Modera Jackson," "have no control over affecting access to housing at Modera Jackson," and "had no ownership interest in Modera

Jackson." Dkt. No. 124-1 at 7; *see NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992) (observing that Congress wrote Section 3604 "in the passive voice—banning an outcome while not saying who the actor is, or how such actors bring about the forbidden consequence"); *Conn. Fair Hous. Ctr. v. Corelogic Rental Prop. Sols., LLC*, 369 F. Supp. 3d 362, 370) (D. Conn. 2019) (same); *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) ("[T]he language 'interfere with' [in Section 3617] has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.") (citation modified); *see also Meyer v. Holley*, 537 U.S. 280, 285 (2003) (noting that the FHA "focuses on prohibited acts" and "says nothing about [defendants'] vicarious liability"). NWSS and Larson cite no authority supporting the proposition that service providers must also be housing providers to be held liable under the FHA. Indeed, courts have noted that "[w]hile it is true that the majority of cases under § 3604(b) involve providers of housing who are also responsible for the services associated with the dwelling, the text of § 3604(b) does not limit its applicability in such a manner and our case law has never held that only housing providers are subject to liability thereunder." *Georgia St. Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 635 (11th Cir. 2019) (upholding FHA claim challenging municipality's allegedly discriminatory provision of utility services to residents even though it is not a housing provider); *see also Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359–60 (6th Cir. 1995) (rejecting plaintiffs' argument that "the provision of insurance is too attenuated to the availability of housing for insurance providers to be governed by the Fair Housing Act"). This Court agrees that, absent the application of one of the limited exceptions contained in Sections 3603(b) or 3607, service providers[2] who commit acts

---

[2] NWSS and Larson do not dispute that the security services they provided at Modera Jackson are "services" rendered "in connection" with the provision of housing. *See generally* Dkt. No. 124-1; Dkt. No. 146; *see also* 42 U.S.C. § 3604(b).

1    proscribed by the FHA may be held liable under the statute. Thus, the FHA applies to NWSS and

2    Larson.

3        2.  FHA Claims

4        NWSS and Larson seek summary judgment on Mendy's claims that they "created a hostile

5    housing environment based on race[]" under Section 3604(b) and "interfered with [his] Fair

6    Housing Rights" under Section 3617. Dkt. No. 123 at 1; *see also* Dkt. No. 124-1.

7        The Ninth Circuit has held that 42 U.S.C. § 3604(b), which prohibits "discriminat[ion]

8    against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because

9    of race, color, religion, sex, familial status, or national origin," prohibits "discriminatory

10   harassment that creates a hostile environment." *See Morris v. W. Hayden Ests. First Addition

11   Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1147 (9th Cir. 2024), *cert. denied,* 145 S. Ct. 1127

12   (2025). "[A] plaintiff may establish that he suffered a hostile housing environment by showing

13   that he was subjected to (1) severe or pervasive harassment (2) that was based on a protected

14   characteristic, . . . and (3) that the defendant is responsible for the resulting hostile housing

15   environment." *Id.* Section 3617 of the FHA provides that it is "unlawful to coerce, intimidate,

16   threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having

17   exercised or enjoyed, or on account of his having aided or encouraged any other person in the

18   exercise or enjoyment of, any right granted or protected by" the Act. 42 U.S.C. § 3617. A plaintiff

19   establishes a prima facie case of FHA interference by showing that "(1) [he] was engaged in

20   protected activity; (2) [he] suffered an adverse action; and (3) there was a causal link between the

21   two." *Ohio House, LLC v. City of Costa Mesa*, 135 F.4th 645, 670 (9th Cir. 2025) (quoting *Brown

22   v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003)).

23       Courts in the Ninth Circuit apply the *McDonnell Douglas* three-part burden-shifting

24   framework to both FHA-interference claims and hostile housing environment claims, *id.*; *Morris*,

104 F.4th at 1146–47, meaning that (1) if the plaintiff establishes a prima facie case, (2) the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the action, at which point (3) the burden shifts back to the plaintiff to raise a genuine factual question as to whether the proffered reason is pretextual, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025) (citation modified). Although "cases have sometimes described the *McDonnell Douglas* inquiry as a 'burden-shifting' framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 308 (citation modified).

*(a) Section 3617*

Here, Mendy asserts that NWSS and Larson "'interfered' with [his] exercise and enjoyment of his dwelling based on Race" under 42 U.S.C. § 3617 by "discriminat[ing] in the terms and conditions of housing." Dkt. No. 142 at 13. Mendy argues that the following "circumstantial evidence" would "allow[] a jury to infer racial discrimination against Larson and NWSS," *id.*:[3]

(1) Larson's accusation that Mendy assaulted him was false, Dkt. No. 142 at 14 (citing Dkt. No. 131-2 at 3);

(2) Larson made "prior inconsistent statements," *id.* (unhelpfully citing "*[s]upra* III(D)," apparently in reference to inconsistencies in Larson's descriptions of where Mendy hit him, *see id.* at 7);

(3) [Patrick] Churaman's observation that "Mendy [had] his hands up while Larson blocked his efforts to reach the elevator" "supports Mendy's version of events," *id.* at 14 (unhelpfully citing "*[s]upra* III(F)," apparently expecting the Court to find the correct cites to the record among the various cites in that section);

(4) "criminal assault charges against Mendy were dropped," *id.* (citing no record evidence);

(5) "Larson admits that when he's seen Caucasian tenants in the 5th floor lounge . . . he has not made a false accusation of assault against the white tenants" such that "a jury could

---

[3] This is just one example of many careless mistakes and confusingly-worded and at times nonsensical sentences in Mendy's briefing. *See also, e.g.*, Dkt. No. 150 at 6–7 ("Ms. Alexander's memory is at best foggy as to why she made that situation because at her deposition she first claimed she didn't remember, and then later intimated that possibly her coworker, Patrick Churaman, told her no footage of the incident existed, and then later ."). The Court presumes that Mendy intended to argue that this evidence would allow a jury to "infer" racial discrimination against *Mendy*.

infer that Mr. Larson only makes allegations of assault or bad behavior against Black tenants like Mendy or [Shaquelle] Duncan,"[4] *id.* at 15 (unhelpfully citing "Ex. R at 123:21–24," which does not exist, *see* Dkt. Nos. 143, 143-1);

(6) Larson departed from NWSS's policy that "emphasizes de-escalation and non-provocation" when he tried to prevent Mendy from leaving in the elevator, Dkt. No. 142 at 15 (unhelpfully citing "*[s]upra* III(E)," which does not say anything about a policy of de-escalation or non-provocation but instead mentions a policy of "not initiat[ing] contact with individuals" and includes a quote from Larson stating that he "went against company policy and kept [Mendy] from leaving" after Larson saw that police had arrived (citing Dkt. No. 143-1 at 2)); and

(7) Larson's interaction with Duncan shows that he has a "propensity to make false allegations of misbehavior against Black tenants," *id.* at 16 (citing no evidence in support).

The Court begins with the admissibility of the above-cited (or uncited) evidence. As NWSS and Larson argue, "[Mendy] offers nothing more than inadmissible conjecture to suggest Mr. Larson's . . . conduct was somehow motivated by racial animus." Dkt. No. 146 at 4. Starting with Mr. Larson's interaction with Duncan, there are numerous reasons why the Court cannot consider this evidence. First, Mendy cites no evidence to support these arguments. Dkt. No. 142 at 15–16. It is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if he elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir. 1995)). Plaintiffs must be held to their burden, as "judges are not like pigs, hunting for truffles buried in the record," *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (citation modified), and "cannot manufacture arguments for a[ litigant]," *Melnik v. Dzurenda*, 14 F.4th 981, 988 n.2 (9th Cir. 2021) (citation modified). Furthermore, "[u]nder the principle of party presentation, courts must presume 'that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Todd R. v. Premera Blue Cross Blue Shield of*

---

[4] Duncan was another resident at Modera Jackson.

1    *Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020) (quoting *United States v. Sineneng-Smith*, 590 U.S.

2    371, 375–76 (2020)).

3         Second, even if the Court could supply citations for Mendy (it cannot), the only evidence

4    it has found in the over-650-page record is an email lacking sufficient guarantees of authenticity

5    that contains hearsay for which Mendy does not supply a hearsay exception. Specifically, in his

6    attorney's declaration submitted in connection with an entirely different motion, Mendy submitted

7    an email from Duncan regarding an incident with Larson that occurred in August 2019. Dkt. No.

8    131-1. This email is part of a single exhibit that includes other emails and email strings, violating

9    Federal Rule of Evidence 1002. In violation of Federal Rule of Evidence 904(a) and Federal Rule

10   of Civil Procedure 56(c)(4), it is not properly authenticated by the declaration of Nolan Lim, which

11   incorrectly states that the exhibit is "an email string from Shaquelle Duncan to Felicity Alexander,"

12   Dkt. No. 131 at 2, when it is really three separate things: (1) an undated email from Mendy's wife

13   to Benoit, apparently in relation to getting an affidavit from Benoit for this lawsuit, Dkt. No. 131-

14   1 at 2; (2) an email string between Duncan and Benoit, *id.* at 2–4; and (3) an email string between

15   NWSS and Benoit, *id.* at 6–9. Assuming without deciding that the August 31, 2019 email from

16   Duncan to Benoit is the actual email that Duncan submitted, it reads:

17           Tonight we reserved the rooftop area when the security guard came up and told us
18           that he had a noise complaint and that we had to turn the music down. He was very
             aggressive and being disrespectful to me and the rest of my group. He told me that
19           he did not care that I was not aware that there was a noise restriction at that time.
             After we exchanged words back and forth he told me that he was going to call the
20           police and I told him that he could if he wanted to.

21           We turned the music off outside and turned the music down inside.

22           I am writing because I am under the belief that the security guard's actions were
             racially charged, as he told dispatch that there were black people in our group and
23           also told them that someone in the group obstructed him from calling the police
             when no one did no such thing. I have about ten witnesses to corroborate my
24           account of events. I am not happy with how this arose or the outcome. I am looking
             forward to speaking with you about this.

1    *Id.* at 4.[5] Had Mendy actually cited this email for his propositions that "Larson only makes

2    allegations of assault or bad behavior against Black tenants like Mendy or Duncan," Dkt. No. 142

3    at 15 (again, unhelpfully citing "Ex. R at 123:21–24," which does not exist),[6] and that "Larson's

4    interaction with Duncan shows that he has a 'propensity to make false allegations of misbehavior

5    against Black tenants,'" *id.* at 16 (citing no evidence in support), Mendy would necessarily have

6    relied upon Duncan's hearsay statement that no one obstructed Larson's call to the police. When

7    reviewing a motion for summary judgment, the Court may "consider admissible evidence," *Weil*

8    *v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 998 (9th Cir. 2019), as well as unauthenticated

9    evidence if the evidence can be presented in a form that would be admissible at trial, *Loomis v.*

10   *Cornish*, 836 F.3d 991, 996 (9th Cir. 2016) (citing Fed. R. Civ. P. 56(c)(2)).  Duncan was

11   apparently not deposed in this case, nor did she submit any declarations. Nor has Mendy offered a

12   hearsay exception. Thus, Mendy has failed to submit any potentially admissible evidence on this

13   point. *See id.* at 996–97 (inadmissible hearsay statements are "not enough to survive summary

14   judgment").[7]

15

16   [5] Again assuming without deciding that the email string is authentic, Benoit then emailed NWSS on September 4, 2019, asking for a "more detailed statement from [NWSS] and [its] agents[']" regarding "exactly what took place,"

17   *id.*, and NWSS responded that Larson only "confirmed that [Duncan] was very rude from the start of the contact, and got ruder when they did not initially comply with the noise complaint and he let them know he was serious about needing to contact 911 if they did not quiet down," *id.* at 6.

18   [6] This is not the first time that counsel representing Mr. Mendy has cited to nonexistent portions of the record. *See, e.g.*, *Stepien v. Raimondo*, No. 2:21-CV-01410-LK, 2024 WL 4043589, at *18 n.17 (W.D. Wash. Sept. 4, 2024)

19   ("Stepien cites to 'Lim Decl. at Ex. 9,' Dkt. No. 51 at 10, but there is no such document attached to Lim's declaration."); *id.* at 15 n.12 ("Stepien cites to 'Exhibit GG' of her counsel's declaration, which she identifies as the deposition transcript of a NOAA employee named 'Turcotte,' Dkt. No. 69 at 24, but there is no Exhibit GG or Turcotte

20   deposition transcript attached to that declaration. Her counsel's declaration states that the deposition transcript is at Exhibit BB, Dkt. No. 70 at 5, but there is no exhibit BB attached to his declaration. There is also no Exhibit EE in the record despite the reference to one. Dkt. No. 69 at 27. This lack of care is reflective of numerous deficiencies in the

21   exhibits Stepien submitted[.]"). Mr. Lim's repeated citation-related failures disserve his client and the Court and violate the requirement under Local Civil Rules 7(b)(1) and 10(e)(6) that litigants cite with specificity supporting

22   evidence in the record.

23   [7] The Court notes that Mendy alleged in his complaint that "[w]henever Mr. Larson saw Mr. Mendy alone or with a black friend, he would ask to see his ID, his key fob or ask what room number he was in," but "[w]henever Mr. Larson saw Mr. Mendy with his partner, who's white, he would refrain from harassing him." Dkt. No. 123 at 5. But Mendy

24   does not raise this in opposition to NWSS and Larson's motion, and in any case, he "cannot defeat summary judgment with allegations in the complaint." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see also*

1    The remaining evidence does not establish any discriminatory intent. That Churaman, the

2    former maintenance supervisor at Modera Jackson, "briefly view[ed] footage of . . . Mr. Mendy

3    and Mr. Larson in the first-floor lobby" showing that Mendy had "his hands up in the air trying to

4    get to an elevator, and Mr. Larson [was] attempting to block his way," Dkt. No. 145-1 at 2; *see*

5    *also* Dkt. No. 162 at 62 ("[Larson] had his hands across this way trying to . . . prevent Mendy from

6    getting in" the elevator), does not suggest racial animus or contradict Larson's version of events,

7    Dkt. No. 131-3 at 5 (Larson testifying that he prevented Mendy from getting on the elevators); *see*

8    *also* Dkt. No. 162 at 65–66 (in viewing the footage, Churaman could not tell whether Mendy or

9    Larson were making any contact with each other). Next, Mendy asserts a false equivalency by

10   suggesting he suffered disparate treatment because Larson has "seen" Caucasian tenants in the

11   fifth floor lounge without "ma[king] a false accusation of assault" against them. Dkt. No. 142 at

12   15. As Mendy appears to acknowledge elsewhere in his brief, it was not "seeing" Mendy that

13   allegedly drove Larson to make a false accusation, but rather Mendy's "oppos[ition to] Larson's

14   hostile conduct." *Id.* at 17 ("Mr. Larson [sic] last query to Mendy" about whether he lived at

15   Modera Jackson "ultimately pushed Mr. Mendy to oppose Larson's hostile conduct, and that lead

16   [sic] to Mr. Larson committing the final last act of race-based hostility by calling the police on

17   Mendy and making false accusations of assault[.]"); *see also* Dkt. No. 146 at 5 (NWSS and Larson

18   arguing that Mendy "offers no evidence establishing 'the white tenants' have ever gotten in Mr.

19   Larson's face, yelled expletives at Mr. Larson, and pursued Mr. Larson throughout the apartment

20   complex."). This is not valid comparator evidence.

21   That Larson falsely accused Mendy of assault, gave conflicting accounts of where Mendy

22   punched him, and departed from company policy by preventing Mendy from leaving the lobby

23

24   *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. 2014) ("[A]llegations in a complaint are not evidence that can be used to support or oppose summary judgment.").

while awaiting the arrival of the police do not establish discriminatory intent.[8] Mendy points to no evidence that his race was a motivating factor for any of Larson's actions.[9] The fact that charges were dropped likewise does not supply discriminatory intent. *Cf. Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948–49 (9th Cir. 2003) (plaintiff failed to establish evidence of discriminatory intent by presenting evidence that (1) police officer is White and he is Black; (2) the officer was able to see the plaintiff's race before pulling him over; (3) the city in which he was pulled over is predominantly White; and (4) the officer unreasonably pulled him over for erratic driving and subsequently did not issue a citation for that behavior), *overruled on other grounds*, *Edgerly v. City & County of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir. 2010). Because the only support Mendy provides for his claim of FHA interference is his own subjective belief that Larson's actions were motivated by racial animus, his claim fails. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a genuine issue

---

[8] *Balazs v. Liebenthal*, 32 F.3d 151, 158–59 (4th Cir. 1994) ("that [plaintiff] had been accused of doing something—sexually harassing his co-workers—which he did not do" had "nothing to do with his race, color, religion, sex or national origin"); *Cain v. Illinois Cent. R.R.*, No. 15 CV 8324, 2018 WL 1138540, at *7 (N.D. Ill. Mar. 2, 2018) ("even assuming that [plaintiff's supervisor and manager] lied about seeing [plaintiff] reclined inside the locomotive [(after which plaintiff was terminated)], there is no indication that they lied because of [plaintiff]'s race."); *Dudley v. New York City Hous. Auth.*, No. 12 CIV. 2771 PGG, 2014 WL 5003799, at *23 (S.D.N.Y. Sept. 30, 2014) ("[Plaintiff]'s allegation that [his supervisor] fabricated bases for subjecting [plaintiff] to discipline is also not sufficient—without more—to demonstrate that [the supervisor] took these actions because of [plaintiff]'s race.").

[9] *See Grillo v. NYC Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2001) (in the absence of evidence of supervisors' racial animus, their reports on plaintiff's poor performance did not support a finding of discrimination, even assuming the supervisors distorted or lied about plaintiff's poor performance); *Merisier v. Kings Cnty. Hosp.*, No. 15-CV-2739(RRM) (RML), 2020 WL 13666419, at *7 (E.D.N.Y. Sept. 29, 2020) (plaintiff failed to establish a prima facie discrimination case under Title VII by asserting that "she was discriminated against because of her race and national origin when she was falsely accused of misconduct and then subject to disciplinary actions"; false accusations and disciplinary actions alone did not "support to her assertion that the alleged discrimination was because of her race or national origin beyond her subjective believe that this was so"); *Jenkins v. Cath. Health Initiatives*, No. 14-CV-00801-REB-CBS, 2015 WL 4464497, at *4 (D. Colo. May 27, 2015) (plaintiff "fail[ed] to meet his burden of showing that his termination was a pretext for discrimination based on his race or age" because "his denial that he made the alleged inappropriate threatening and racial statements does not show that [his employer]'s decision to terminate him was motivated by his race or age"), *report and recommendation adopted*, 2015 WL 4456074 (D. Colo. July 20, 2015); *Risco v. McHugh*, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012) (granting summary judgment to defendants on plaintiff's Title VII discrimination claim because, among other deficiencies, "[e]ven if [plaintiff's supervisor] did exaggerate or lie about [plaintiff]'s conduct or performance, there is no evidence in the record to support a finding that he did so in order to conceal any prohibited motivation based on [plaintiff]'s race or color").

where the only evidence presented is uncorroborated and self-serving testimony.") (citation modified); *cf. Hanners v. Trent*, 674 F.3d 683, 693–94 (7th Cir. 2012) ("[T]here is no evidence to suggest that the focus of the defendants' comments or actions were related to [plaintiff]'s race. . . . Although [plaintiff] may believe that the defendants' statements are evidence of racial animus, the subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact.") (citation modified). The Court therefore grants summary judgment to NWSS and Larson on this claim.

### (b) Hostile Housing Environment

Mendy argues, with no citation to the record, that "a jury could infer that Larson subjected Mendy to severe and pervasive hostility based on Race by querying him about his residency status in the building and ultimately making multiple false allegations of assault." Dkt. No. 142 at 17 ("Mr. Larson [sic] last query to Mendy ultimately pushed Mr. Mendy to oppose Larson's hostile conduct.").

Again, the Court cannot and does not supply citations or evidence for Mendy. Even if it could, the only evidence the Court has found in the record with respect to prior residency queries is Mendy's deposition testimony that after he moved in, there were instances when he would encounter Larson and Larson "would mumble something [i]n a very, very low voice or provoke a question of, like, 'Do you live here?' you know or 'Can I see your ID?'" to Mendy and/or his friends. Dkt. No. 120-4 at 3. Even if the Court could supply this citation to the record for Mendy, it still would not demonstrate (1) severe or pervasive harassment or (2) that such harassment was based on a protected characteristic.[10] Larson's queries to Mendy regarding whether he resided at

---

[10] During his deposition, Mendy was unable to specify how many times Larson asked him about his residency, *id.*, and he has not shown that this conduct was severe or pervasive. *See, e.g.*, *Lauture v. Saint Agnes Hosp.*, 429 F. App'x 300, 306–07 (4th Cir. 2011) ("Although [the employer's] actions, including the erroneous . . . accusation [that plaintiff caused a meningitis exposure], and perceived better treatment of others clearly upset [plaintiff], the alleged actions are not 'sufficiently severe and pervasive to create an objectively abusive atmosphere.'").

1    Modera Jackson, without more, it is not evidence of racial animus, especially considering that

2    verifying residency fell within Larson's job responsibilities and—as NWSS and Larson point

3    out—Mendy "offers no evidence demonstrating Mr. Larson would only ask members of plaintiff's

4    protected class for proof of residency." Dkt. No. 146 at 5; *see also Carlos v. Old Dominion Freight*

5    *Line, Inc.*, No. CV-15-06127-MWF (MRWx), 2016 WL 11758480, at *3 (C.D. Cal. May 19, 2016)

6    (granting summary judgment to defendants on age discrimination claim where "Plaintiff complains

7    that a supervisor 'closely monitored' him during deliveries," but "no evidence indicates that the

8    supervisor—whose job is to *supervise* drivers—did not 'closely monitor' younger drivers").[11]

9         Furthermore, as discussed above, there is no evidence that Larson's allegedly false

10   accusation—while serious—was based on a protected characteristic. *See Nelson v. DeJoy*, No.

11   1:21-CV-01011-RBJ, 2023 WL 4541035, at *5–6 (D. Colo. June 14, 2023) (dismissing plaintiff's

12   Title VII hostile work environment claim because his manager's actions of allegedly "target[ing]

13   [plaintiff] by calling the police and falsely reporting that he was disrupting the workplace, making

14   verbal threats that were almost physical in nature, and potentially putting people in danger[,

15   causing] three police officers to respond to the station and question plaintiff"—"while dramatic

16   and obnoxious—were facially race-neutral," and manager's single reference to plaintiff's race

17   when describing his physical characteristics to police "d[id] not qualify as overtly racially-

18   discriminatory conduct sufficient to sustain a claim of hostile work environment") (citation

19   modified), *aff'd,* No. 23-1227, 2024 WL 3507723 (10th Cir. July 23, 2024). The false accusation

20   by Larson—even when coupled with his queries to Mendy regarding residency—does not establish

---

[11] As the Court noted above, Mendy alleged in his complaint that "[w]henever Mr. Larson saw Mr. Mendy alone or with a black friend, he would ask to see his ID, his key fob or ask what room number he was in," but "[w]henever Mr. Larson saw Mr. Mendy with his partner, who's white, he would refrain from harassing him." Dkt. No. 123 at 5. But again, Mendy does not specifically raise this in opposition to NWSS and Larson's motion, and even if he had, he "cannot defeat summary judgment with allegations in the complaint." *Hernandez*, 343 F.3d at 1112; *see also Briggs*, 70 F. Supp. 3d at 1166.

that Mendy suffered harassment "that was based on a protected characteristic[.]" *Morris*, 104 F.4th at 1147. Accordingly, the Court grants summary judgment to NWSS and Larson on Mendy's hostile housing environment claim.

**D.    Summary Judgment in Favor of the Remaining Defendants is Warranted**

Because Mendy has failed to carry his burden to establish prima facie elements of his FHA claims, there is no basis for derivative liability, and Court grants summary judgment to Mill Creek and ASP. Mendy's motion for spoliation sanctions, Dkt. No. 150, is denied as moot.

## III.   CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

1. NWSS and Larson's Amended Motion for Summary Judgment, Dkt. No. 124-1, is GRANTED;

2. Summary judgment is also GRANTED to Mill Creek and ASP;

3. Mendy's Cross-Motion for Partial Summary Judgment, Dkt. No. 147, Defendants' Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Claim for Punitive Damages, Dkt. No. 148, and Mendy's Motion for Sanctions for Spoliation of Evidence, Dkt. No. 150, are DENIED as moot.

Dated this 2nd day of September, 2025.

Lauren King
United States District Judge